IN THE FEDERAL DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

John Joseph Otrompke, JD )
)
    Plaintiff )
)
v. )
) 03 C 7198
Chairman of the Committee on )
Character and Fitness for the )
First Judicial District of ) J. Kennelly
Illinois (in his official )
Capacity), )
Arleen Anderson, )
James Carroll, Eileen Letts )
(in their individual )
capacities), and the Illinois )
Board of Admissions to the )
Bar, )
)
And Quinlan & Carroll )
  (A Law Firm), )
And its partners, )
WILLIAM QUINLAN, THOMAS HYNES, )
CHERYL NIRO, BRIAN ALESIA, )
MICHAEL BEIRNE, RICHARD BOLLOW )
JANE DOE QUINLAN, JOHN ROE )
CARROLL, and PARTNER X )
)
    Defendants )

THIRD AMENDED COMPLAINT

Now comes Plaintiff, JOHN JOSEPH OTROMPKE, JD, proceeding pro se at this time, and in support of this complaint, hereby pleads and alleges as follows:

INTRODUCTION

1. Plaintiff successfully graduated from DePaul University College of Law and passed the Illinois bar exam and its

1

component parts, the Multistate Professional Responsibility Exam and other tests.

2. Plaintiff, JOHN JOSEPH OTROMPKE, JD, an Illinois resident, first applied to take the Illinois bar around the beginning of 2000.

3. On July 4, 2000, three weeks before he was to take the exam, Plaintiff was arrested by the Chicago Police Department, because he asked for an officer's badge number and threatened to file an administrative complaint against the officer, said arrest being premised on false and outrageous charges, which were subsequently dismissed.

4. Subsequent to his receipt of a passing score on the Illinois bar exam, defendant ARLEEN ANDERSON, a member of defendant COMMITTEE ON CHARACTER AND FITNESS, scheduled a hearing to inquire as to his fitness to receive any attorney's license.

5. The hearing was held before an inquiry panel of three members, including defendant JAMES CARROLL, and in the law offices of Quinlan & Carroll, a law firm.

6. That the inquiry panel met for the first time for two hours in February of 2001, at the law offices of Quinlan & Carroll.

7. The panel met for the second and last time in May 2002, for approximately 2 hours, at which time Plaintiff

   informed the panel members that he had terminated his marital engagement.

8. That after 1 ½ years of meetings, Defendants declined to certify Plaintiff, on the basis of a 6-page opinion which did not comport with due process.

9. During the licensure proceedings, Plaintiff alleged that his arrest had been precipitated by Plaintiff's request for the arresting officer's badge number, and Plaintiff's threat to file an administrative complaint alleging that the police officer had committed a civil rights violation.

10. The charges filed against Plaintiff relating to this arrest were subsequently dropped.

11. Plaintiff first presented, and requested the right to call, witnesses in February of 2001.

12. Despite repeated requests, Defendants never scheduled a hearing at which Plaintiff would be allowed to call witnesses until some time after June of 2002.

13. Such a hearing did not in fact take place until December of 2003.

14. Defendant JAMES CARROLL served on the inquiry panel in Plaintiff's licensure matter.

15. On information and belief, Defendant JAMES CARROLL and/or the law firm in which he was a partner had previously represented the City of Chicago and/or the Chicago

3

Police Department and/or other police departments and/or other municipalities which had been accused of civil rights violations.

16. The panel members considered the facts underlying Plaintiff's July 4, 2000 arrest in their deliberations and the arrest is referenced in their decision in the matter.

17. The facts alleged in p. 15 above were never disclosed by the Defendants to the Plaintiff.

18. Plaintiff filed the original complaint in this cause on October 10, 2003.

19. On October 22, 2003, The BOARD OF ADMISSIONS and the COMMITTEE ON CHARACTER AND FITNESS caused to have mailed to Plaintiff a letter demanding that Plaintiff sign a waiver of liability form before Plaintiff would be allowed to proceed to a hearing.

20. On information and belief, it is a standard practice of these bodies, though unconstitutional and void in contractual terms, to demand that each new generation of law students sign these forms before their applications to practice are considered.

21. An applicant who is denied admission to the Illinois bar on character and fitness grounds is permitted to reapply two years hence.

4

22. The COMMITTEE and its members and associates have a long and established history of repressing political expression and association.

COUNT ONE: DUE PROCESS AND 42 USC 1985(2) AND(3)

23. Notwithstanding the contrary assertions of defendant, Plaintiff has a fundamental interest and a right to follow any of the traditional chosen Professions, which may not be denied him unless the state proves moral turpitude by clear and convincing evidence.

24. In the pursuit of his fundamental right to a profession, it is well established in federal law that Plaintiff has certain procedural due process rights which are Constitutionally guaranteed, to wit:
    a. the right to a neutral, disinterested decision maker,
    b. the right to a prompt post-deprivation hearing,
    c. the right to notice of the allegations against her or him,
    d. the right to fair procedures, and a tribunal which follows its own rules, the laws of its state and federal law,
    e. the right that Constitutionally-protected activities will not be weighed against him,
    f. the right to call witnesses for and/or against him.

5

25. That, on information and belief, no pre-deprivation hearing was ever offered to Plaintiff in this cause.

26. The total delay in post- deprivation proceedings before the Inquiry Panel, counting from the time when Plaintiff's peers were sworn in until the first hearing at which Plaintiff could call witnesses was ever scheduled was roughly 20 months.

27. In February of 2001, Defendants demanded the release of Plaintiff' counseling records, in violation of 740 ILCS 110.

28. That such records were medically innocuous and legally irrelevant.

29. Defendant, ILLINOIS COMMITTEE ON CHARACTER AND FITNESS, and/or other defendants, have established a practice of demanding such privileged information of pain of summary denial. <u>Edwards v Illinois Board of Admissions to the Bar</u>, No. 00-2146, cited in *Chicago Daily Law Bulletin*, August 23, 2001, page 1.

30. During his relationship with his fiancée of that time, beginning in May of 1999 Plaintiff sought and received counseling services at his law school and subsequently at a community clinic to improve his relationship with his fiancée, which was very important to Plaintiff, his fiancée and her family.

6

31. Legal precedent and common decency have established that the confidentiality of relationship counseling records is vital to the establishment of healthy marriages and other relationships, and family lives.

32. Had Plaintiff wanted to receive emotional counseling during this time, as his fiancée of the time requested, Plaintiff would have been unable to do so because every word would have been eavesdropped upon by the outrageous intrusion of the biased ears of the inquiry panel.

33. Less than two months before being falsely arrested and abused by the Chicago Police Department, Plaintiff had participated in an elaborate and heartfelt engagement ceremony with his fiancee' in front of roughly 75 of their closest friends, which moment was captured forever in photographs.

34. Within one month of being informed of the meeting of the inquiry panel, Plaintiff terminated his engagement in the hope of fostering the approval of the conflicted defendants on the inquiry panel.

35. The termination was caused in part by stress engendered by the unconstitutional delay in the Character and Fitness proceedings; the insensitive demand for Plaintiff's counseling records; and the trauma of the false arrest of July 4, 2000 (see below).

36. Defendants also engaged in other unfair tactics of harassment against Plaintiff, such as violations of Board of Admissions Rule 7 pertaining to confidentiality, which injured Plaintiff's reputation.

37. On information and belief, Defendants also caused or engaged in a violation of the federal Privacy Act by seeking access to Plaintiff's legally-protected federal records.

38. On information and belief, COMMISSIONER ANDERSON also disclosed information gleaned in the course Plaintiff's bar admission proceeding, assisting in the infiltration of various anti-war groups by the Chicago Red Squad around the time of the Trans-Atlantic Business Dialogue in 2002.

39. The delay in these proceedings coupled with comments made by the panel led in part, directly or indirectly, to the loss of a $300,000 tort claim against the City of Chicago, which had been evaluated by an independent attorney.

40. That the lengthy proceedings to which Plaintiff has been subjected, constitute the equivalent of a 4 ½-year suspension, an unusually harsh sanction for a beginning attorney, and the equivalent of a hefty tax on Plaintiff's dissent.

41. On information and belief, the COMMITTEE does not normally subject applicants to such a lengthy delay or denial based on relatively innocuous misconduct.

42. Having forgotten his once thorough knowledge of the Uniform Commercial Code, the Federal Rules of Evidence and other matters, upon admittance, Plaintiff will now be obligated to incur additional educational expenses.

43. Plaintiff incurred attorney's fees throughout these proceedings.

44. Plaintiff also enjoyed numerous lucrative requests for legal assistance, which requests Plaintiff had to turn down to his financial detriment.

45. Defendants knew that these circumstances would cause Plaintiff severe emotional upset.

46. Plaintiff's emotional injury was in fact caused by the duration and insensitive manner of these proceedings, especially the oppression by a biased panel with unfair procedures, the punishment of his constitutionally protected conduct with no apparent legal recourse, the termination of his engagement, and the intrusion into his psychic life established by defendant and its rapacious demands, as well as the extreme and outrageous underlying conduct by the Chicago Police Department (see below).

47. At the time of the Plaintiff's character and fitness proceedings, Defendants knew that the rules they were operating under were unconstitutional (see below).

## LAW FIRM DEFENDANT

48. Defendants were motivated in part by a discriminatory animus caused by Plaintiff's political beliefs to harass and take various measures against Plaintiff

49. The 1996 Democratic National Convention in Chicago was the occasion for numerous protests.

50. Various litigation occurred related to these protests, concerning various individuals who subscribed to particular unorthodox political philosophies, and including the malicious prosecution of five of Plaintiff's closest friends on felony charges for organizing protests, all five of whom were acquitted.

51. In the late spring or early summer of 2002, Plaintiff first began to suspect that the appearance of an adverse pecuniary bias existed in this cause, when Plaintiff discovered an article in the Evanston Roundtable, entitled "Trial Court Upholds $11 Million Judgment Against City in Police Chase Lawsuit," discussing a police fatality case- to be appealed by QUINLAN & CARROLL.

52. Then, around the time of the late Summer of 2003, plaintiff discovered a reference on the firm's web-site to litigation from the 1996 Democratic Convention, apparently handled by a relative or a descendant of COMMISSIONER CARROLL or Mr. QUINLAN.

53. This same material on the web-site made reference to certain litigation including, on information and belief, "strip searches" or sexual harassment litigation recently spoken of by COMMISSIONER CARROLL in this case.

54. On information and belief, COMMISSIONER CARROLL's partner, Mr. QUINLAN, is the former Corporation Counsel for the City of Chicago.

55. In February of 2001, Plaintiff told the inquiry panel that on July 4, 2000, Plaintiff had believed that a false arrest was taking place, and that it was a violation of the consent decree in the Alliance to End Repression case.

56. The Inquiry Panel was also told that the charges against Plaintiff's ex-fiancee were "mixed-up" and inconsistent with her possession of lawfully-proscribed prescription medicine.

57. During the same meeting, COMMISSIONER ANDERSON asked whether, at the time of his ex-fiancee's false arrest, Plaintiff had been working for an attorney he knows who helped to organize a rally during the '96 Convention.

11

58. During the proceedings before the Inquiry Panel, Defendants also made numerous statements and innuendo, such as, for example:

a. "If you're going to file a complaint against a police officer, I'd be afraid you'd file a complaint against an attorney." EILEEN LETTS- February 2001.

b. "Were you working for Melinda Power [a progressive attorney who has organized 20 annual International Women's Day marches in Chicago] at the time that the police filed false charges against your fiancee'?" (or words to that effect)- ARLENE ANDERSON, February 2001

c. "You should know better than to go around making unfounded allegations against police officers." -JAMES CARROLL, February 2001

d. "It is very inappropriate for you to have brought an attorney and witnesses here today. Now, I don't want to hear any objections; we'll save those for the proceedings before the Committee, when the rules of evidence will apply," or words to that effect -JAMES CARROLL, February 2001

e. "Weren't you afraid that you would ever get into trouble, because of your fiancee's political associations?" JAMES CARROLL, April 2002

59. By no later than August of 2002, Defendants must have learned that Plaintiff had subscribed to a particular unorthodox political philosophy (see pr. 49).

60. Plaintiff asserts the social-worker/client privilege.

61. On information and belief, COMMISSIONER CARROLL had learned by around that time that QUINLAN & CARROLL had a prior conflict-of-interest in Otrompke's bar admission proceeding, relating to the false arrest of July 4, 2000, and the '96 Convention litigation handled by the relative of one of the partners as described above.

62. On information and belief, COMMISSIONER CARROLL then discussed the apparent conflict with his relative or the relative of Mr. QUINLAN, and/or other members of the firm.

63. COMMISSIONER CARROLL and/or the other Defendants then decided to delay Otrompke's total inquiry panel proceedings for an additional 11 or 12 months.

64. In April of 2002, COMMISSIONER ANDERSON asked Plaintiff, "When the Inquiry Panel last met- was that 9 months ago?" Plaintiff replied that the last meeting had been over a year before. At that time, rather than disclose to Plaintiff that QUINLAN & CARROLL had a conflict of interest in the matter, all three COMMISSIONERS instead laughed me straight in my face.

13

65. On information and belief, QUINLAN & CARROLL or its past or present partners or associates were involved in certain civil rights litigation from the '96 Convention alleging unconstitutional conduct against certain protesters or political activists.

## THE FALSE ARREST OF JULY 4, 2000

66. On July 4, 2000, Plaintiff was leaving a meeting space operated and used for the propagation of political dissent when he observed the Chicago Police searching a vehicle.

67. The police had already arrested an individual upon leaving this meeting space, who was already in the backseat of the locked squad car at the time.

68. On information and belief, the charges against this individual were later found to be of a non-criminal nature.

69. A number of young people had moved across the street and were observing from where they sat against a wall.

70. Plaintiff was in front of the police officers together with his fiancée of the time when Plaintiff asked the officer for his badge number.

71. Plaintiff asked a Chicago Police officer for his badge number, and said, "I'm going to file a complaint with OPS [the Office of Professional Standards]."

14

72. Plaintiff intended to report the incident as a false arrest, a violation of the previously arrested individual's First Amendment right of association, and a violation of a Chicago consent decree in a suit brought by the <u>Alliance to End Repression</u>, relating to protected political activity and police spying.

73. An officer at the scene said, "If you're going to file an OPS complaint, you might as well go to jail," and arrested Plaintiff.

74. After Plaintiff's arrest, the Chicago Police Department exhibited shameful behavior to Plaintiff, to wit, the arresting officer told Plaintiff that his fiancée of the time had been arrested, and falsely stated that she was in a strait-jacket and had been institutionalized.

75. The same officer falsely told Plaintiff's fiancée of the time that the officer had broken Plaintiff's arm, and that she would have to meet Plaintiff in a hospital upon her release.

76. Plaintiff's fiancée was then subjected to the willfully false charge of criminal possession of her lawfully-prescribed medication, said charges being subsequently dismissed, presumably for lack of evidence, considering that Plaintiff's fiancée's medication was not even a controlled substance.

77. Plaintiff's fiancée of the time was then kept incarcerated for two days and deprived of her anxiety medication until she was taken to a hospital, where she was handcuffed to a hospital bed and abused by Officers of the Chicago Police Department.
78. Further, that later that evening, a different officer, being Caucasian, male, and overweight, entered the room where Plaintiff had been handcuffed and stated as follows to Plaintiff: "Little faggot- got a problem?"
79. Plaintiff's charge, disorderly conduct, was later dismissed, and Plaintiff demanded trial, Plaintiff having exhibited no sign of disrespect, including raising his voice or swearing oaths before his arrest or while in the custody of the Chicago Police Department.

WHEREFORE, Plaintiff, JOHN JOSEPH OTROMPKE, requests at least nominal damages and such other good and appropriate relief as this Honorable Court may allow.

COUNT II: PROSPECTIVE INJUNCTIVE AND DECLARATORY RELIEF

80. Paragraphs A through 70 are incorporated as though fully set forth herein.
81. While Plaintiff was denied certification by the COMMITTEE and the Illinois Supreme Court denied his petition for review, Plaintiff may seek admission to the Illinois bar again at a later date.

16

82. Illinois Supreme Court Rule 708(b) provides:

> Upon law student character and fitness registration and, where appropriate, upon application to take the bar examination, each law student registrant or applicant shall be passed upon by the committee in his or her district as to his or her good moral character and general fitness to practice law. <u>If required by the committee, each law student registrant or applicant shall appear before the committee of his or her district or some member thereof and shall furnish the committee such evidence of his or her good moral character and general fitness to practice law as in the opinion of the committee would justify his or her admission to he bar.</u>

(underlining added).

83. Illinois bar Admissions Rule 4.1 provides:

> The Committee shall determine whether to recommend to the Board that the law student registrant or applicant possesses the requisite character and fitness for admission to the practice of law. If the Committee deems it necessary or appropriate under the circumstances, it shall conduct further investigation of the law student registrant or applicant before ascertaining his or her character and fitness. <u>The law student registrant or applicant has the burden to prove by clear and convincing evidence that he or she has the requisite character and fitness for admission to the practice of law</u>

(underlining added).

84. Illinois Bar Admissions Rule 9.2 provides in relevant part:

> <u>The Committee may deny the petition for new hearing</u> without hearing testimony of witnesses, <u>if the petition does not meet the foregoing requirements of this Rule and if the petition does not set forth substantial new matter which would *prima facie* overcome the reasons for the previous denial and establish that the law student registrant or applicant now has the good moral character and general fitness to practice law which would justify certification.</u>

(underlining added).

85. Illinois Bar Admissions Rule 4.2 provides:

> A law student registrant or applicant may be recommended for certification to the Board if the Committee determines that his or her record of conduct justifies the trust of clients, adversaries, courts and others with respect to the professional duties owed to them. A record manifesting a deficiency in the honesty, trustworthiness, diligence, or reliability of a law student registrant or applicant may constitute a basis for denial of admission. The revelation or discovery of any of the following should be treated as cause for further detailed inquiry before the Committee decides whether the law student registrant or applicant possesses the requisite character and fitness to practice law: <u>(1) unlawful conduct; (2) academic misconduct; (3) making false statements, including omissions; (4) misconduct in employment; (5) acts involving dishonesty, fraud, deceit or misrepresentation; (6) abuse of legal process; (7) neglect of financial responsibilities; (8) neglect of professional obligations; (9) violation of an order of a court; (10) evidence of conduct indicating instability or impaired judgment; (11) denial of admission to the bar in another jurisdiction on character and fitness grounds; (12) disciplinary action by a lawyer disciplinary agency or other professional disciplinary agency of any jurisdiction; and (13) acts constituting the unauthorized practice of law; (14) failure to comply with the continuing duty of full disclosure to the Board and the Committee subsequent to the date of registration or application.</u>

(underlining added).

86. Illinois Bar Admissions Rule 4.3 provides:

> The Committee shall determine whether to recommend to the Board that the present character and fitness of a law student registrant or applicant qualifies him or her for admission to the practice of law. In making this determination, the following factors shall be considered in assigning weight and significance to the law student registrant's or applicant's prior conduct: (1) age at the time of the conduct; (2) recency of the conduct; (3) reliability of the information concerning the conduct; (4) seriousness of the conduct; (5) factors underlying the conduct; (6) cumulative effect

18

of the conduct; (7) evidence of rehabilitation; (8) positive social contributions since the conduct; (9) candor in the admissions process; and (10) materiality of any omissions or misrepresentations.

87. Illinois Bar Admissions Rule 9.1 provides in relevant part:

   Any law student registrant or applicant who has been denied certification as hereinabove provided may petition the Character and Fitness Committee issuing the denial for a new hearing, but not within two years of the date the Committee mailed its Findings and Conclusions to the law student registrant or applicant, unless a shorter time is allowed by the decision of the Committee or by the Supreme Court.

88. Illinois Supreme Court Rule 710 provides:

   Any person who communicates information concerning a law student registrant or an applicant for admission to the Illinois bar to any member of the Illinois Board of Admissions to the Bar or to any member of the Character and Fitness Committees or to the Director of Administration, administrators, staff, investigators, agents, or attorneys of the Board or such Committees shall be immune from all civil liability which, except for this rule, might result from such communication. The grant of immunity provided by this rule shall apply only to those communications made by such persons to any member of the Illinois Board of Admissions to the Bar or to any member of the Character and Fitness Committees or to the Director of Administration, administrators, staff, investigators, agents, or attorneys of the Board or such Committees.

89. The opinion of the COMMITTEE ON CHARACTER AND FITNESS for the First Judicial District of Illinois makes reference to this instant lawsuit on pages 10 and 11 and 19 and 20, and the Court may take judicial notice that the opinion has been attached to Defendants' most recent Motion to Dismiss of October 27, 2004.

90. The transcript of the administrative proceedings before the Committee, which has been attached as 'Exhibit A' in relevant part, also refers to this instant federal court lawsuit.

19

WHEREFORE, Plaintiff, JOHN JOSEPH OTROMPKE, pro se, hereby requests this Honorable Court to declare Illinois Supreme Court Rule 708(b), Illinois bar Admissions Rule 4.2, and Illinois Bar Admissions Rule 9.2 to be in violation of the due process clause of the Fifth Amendment and the privileges and immunities clause of the Fourteenth Amendment to the United States Constitution; to declare Illinois Bar Admissions Rule 4.2 and Rule 4.3 to be unconstitutionally vague and overbroad, and, as applied, a violation of the First Amendment, the due process clause of the Fifth Amendment, and of the Equal Protection clause of the Fourteenth Amendment; to declare that Illinois Bar Admissions Rule 9.1, on its face and as applied, is a violation of the First Amendment, due process and equal protection principles; and to declare that Illinois Supreme Court Rule 710 is a violation of the First Amendment.

FURTHERMORE, Plaintiff requests this Honorable Court to award injunctive relief, permanently enjoining Defendants from enforcing the above-cited barbaric, unconstitutional, harmful and ill-conceived provisions forevermore and without exception; ordering Defendant BOARD to permit Plaintiff to reapply for admission to the Illinois bar immediately; and ordering Defendants to reconsider Plaintiff's petition at the time of his reapplication without reference to any constitutionally-protected First Amendment activities or other factors which are prohibited from being held against a person by reason of the United States Constitution;

That Defendant(s) shall be permanently and forever ordered to refrain from the issuing of waivers of liability to law applicants and others; AND SUCH OTHER GOOD AND APPROPRIATE RELIEF AS THIS HONORABLE COURT MAY ALLOW.

Respectfully submitted,

John Joseph Otrompke, JD

John Joseph Otrompke, JD,
pro se
1444 W. Pratt Blvd. (garden)
Chicago IL 60660
(773) 508-5531